[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a marital dissolution action heard by the court on December 18, 1998. At the close of the evidence, and pursuant to the parties' stipulation, the court entered judgment dissolving the marriage and reserved decision on the terms of the marital dissolution judgment. This memorandum sets forth the court's findings and orders.
The parties were married on September 15, 1984 in Bloomfield, Connecticut. They have two minor children, Aaron, who was born on June 18, 1986 and Lauren, who was born on August 17, 1989. No CT Page 984 other children have been born to the defendant since the date of the marriage. The court has jurisdiction over the parties, the children, and the marriage.
At the commencement of the hearing, the parties, and the children through their counsel, jointly requested that their stipulation dated October 9, 1998, concerning the custody and care of the children, be accepted and made an order of the court as part of its final judgment. The court finds that the stipulation was freely and knowingly entered into by the parties. With the exception of the portion of paragraph 12 stating that the parenting plan is temporary and entered without prejudice to either party, the provisions of the stipulation are approved by the court and may enter as orders.
By the terms of the parties' parenting agreement, they share physical and legal custody of the children. While the children reside with their father more evenings than with their mother, both parents actively participate in the care of the children.
The parties disagree concerning child support, alimony, the division of assets, and the payment of litigation-related expenses.
The plaintiff is a forty-two year old physician in apparently good health. The defendant, age forty-one, completed two years of college. As a result of additional technical schooling, she has employment experience as a pharmaceutical technician and a dental assistant.
The parties met in 1982 at a veterans' hospital where the defendant was working as a pharmaceutical technician and the plaintiff was a resident physician. Mrs. Bernstein continued working as a pharmaceutical technician and later as a dental assistant until the parties' first child was born in 1986. During her employment, Mrs. Bernstein earned approximately eighteen to twenty thousand ($18,000-$20,000) dollars a year. In her last employment as a dental assistant, she received pay of ten ($10) dollars an hour. The plaintiff completed his residency and, in 1981 he began a medical practice as a solo in Somers, Connecticut. He is Board certified in otolaryngology and maintains an affiliation with Johnson Memorial Hospital in Stafford Springs.
In 1986, the parties purchased a home for one hundred and CT Page 985 twenty thousand ($120,000) dollars with a down payment of twenty-four thousand ($24,000) dollars, comprised of five thousand ($5,000) dollars realized from the sale of stock and the rest as a loan from the hospital. The parties later sold this house, and in 1992 they purchased a residence located at 453 North Main Street in Suffield, Connecticut for three hundred and fifty thousand ($350,000) dollars. This home, which is presently occupied by the plaintiff and the parties' children, was appraised in 1998 at three hundred and sixty thousand ($360,000) dollars. With a mortgage balance of approximately two hundred and fifty-one thousand ($251,000) dollars, its gross equity is approximately one hundred and nine thousand ($109,000) dollars.
In 1988, the plaintiff purchased an office condominium at 146 Hazard Avenue in Enfield to house his practice for three hundred and three thousand ($303,000) dollars. A 1998 appraisal of this property posits its present fair market value as two hundred and fifty thousand ($250,000) dollars. With a present mortgage of approximately one hundred and forty-five thousand ($145,000) dollars, this property has gross equity of approximately one hundred and five thousand ($105,000) dollars. Also, the plaintiff has a line of credit for his practice secured by this property with a current balance of approximately twenty-seven thousand ($27,000) dollars.
During the early years, through the birth of both children and the establishment of the plaintiff's practice, the parties' marriage was reasonably harmonious. Though the defendant testified that the plaintiff was insensitive and not supportive to her, love cards and notes she gave to the plaintiff throughout this time period diminish the reliability of this claim. Over time, the relationship worsened. Mrs. Bernstein suffered periods of depression, influenced in some degree by her perception that Dr. Bernstein was not consistently emotionally available to her. In turn, Dr. Bernstein noted on the part of his wife a withdrawal from intimacy and an increased reticence to mix socially. While their personal relationship was eroding, the parties nevertheless enjoyed an increasingly plentiful lifestyle including vacations, particularly to New Orleans where they shared an enthusiasm for antique collecting.
In 1994, the defendant began treatment with a psychiatrist for depression, and she began a regimen of medication. Though she was diagnosed as having a depressive disorder, she discontinued treatment in the latter part of the year and presently disclaims CT Page 986 any continuing depression. The parties also met with a marriage counselor in 1994. These sessions ended at the instance of Mrs. Bernstein who perceived that the counselor was overly supportive of her husband's point of view.
The marriage came unraveled in 1997. While the plaintiff noted that the peaks and valleys of the defendant's emotions appeared to be steep, he was unaware that the plaintiff's attentions had turned elsewhere. At the beginning of March, the defendant responded to a personal ad in the Springfield Advocate placed by a (then) unnamed male seeking a love relationship. Soon thereafter, and while she continued to reside with the plaintiff, the defendant began a romance with Mark LeBranche, who was then married. In April, the defendant and Mr. LeBranche spent a weekend together. When she returned home, she informed the plaintiff of her desire for a divorce. It is clear from the trial evidence that by early 1997, and unbeknownst to the plaintiff, the defendant had ceased her commitment to the marriage, and she simultaneously began an extramarital affair with Mr. LeBranche. Her behavior was the primary cause of the dissolution of the marriage.
Also in the spring of 1997, Mrs. Bernstein withdrew approximately six thousand ($6,000) dollars from one joint savings account and thirteen hundred ($1,300) dollars from another without Dr. Bernstein's knowledge.
During the parties separation, Dr. Bernstein has withdrawn and expended approximately forty-two thousand ($42,000) dollars from a money market fund. These funds were utilized by the plaintiff for routine household expenses, to pay alimony to the defendant, and to pay expenses attendant to this litigation.
The defendant left the marital home in July, 1997 and moved to another home in Suffield. She presently resides at 815 Burbank Avenue in Suffield. Shortly after Mrs. Bernstein moved from the family residence, Mr. LeBranche began spending evenings with her. During his testimony, Mr. LeBranche acknowledged that he spends twenty to twenty-five evenings a month at her residence. While Mr. LeBranche nominally maintains a room at an apartment in Amherst, Massachusetts occupied by his mother and sister, it is plain from the evidence that he resides with Mrs. Bernstein at her Suffield residence in an ongoing love relationship, staying with her most evenings when the children are not there for the night. During the hearing, Mr. LeBranche and Mrs. Bernstein CT Page 987 separately avowed their love for each other and their expressed intention to be married.
Mr. LeBranche, who was divorced in April of 1998, is a sergeant in the security force of the University of Massachusetts at Amherst and the father of three children. With overtime, Mr. LeBranche earns gross annual compensation of approximately fifty-four thousand ($54,000) dollars. He pays weekly child support of four hundred ($400) dollars to his former wife. Although he presently makes no regular payment to Mrs. Bernstein for household expenses, Mr. LeBranche's earnings suggest an ability to pay a fair share.
On her financial affidavit, Mrs. Bernstein indicates a weekly need of six hundred and thirty-two ($632) dollars for ongoing expenses and an additional ninety-two ($92) dollars for payment on liabilities. Thus, she presents a total weekly need for seven hundred and twenty-four ($724) dollars to meet her ongoing expenses, whether from employment, assistance from Mr. LeBranche, support from the plaintiff, or a combination of them.
The court finds credible the plaintiff's testimony that his medical practice has a value of approximately twenty thousand ($20,000) dollars, based on equipment worth approximately ten thousand ($10,000) dollars and good will of approximately ten thousand ($10,000) dollars. The plaintiff earns approximately two hundred thousand ($200,000) a year from his practice. While his earnings have been higher in past years, the combination of managed care and his increased responsibilities for the care of the children since the parties' separation have impacted negatively on his gross earnings. From his financial affidavit, it appears that the plaintiff's average weekly net compensation, before pension contribution, is approximately two thousand, eight hundred and fifty ($2850) dollars. From this amount, the defendant pays the approximate sum of three hundred ($300) dollars a week (two hundred and fifty [$250] dollars directly and another fifty [$50] dollars in expenses) for a "nanny" who assists in the care of the children. Thus, he has approximately two thousand, five hundred and fifty ($2,550) dollars available weekly to meet his personal and household needs and to fulfill his responsibilities to Mrs. Bernstein and the children.
The defendant testified that she has made no efforts to find employment since the separation because she has had child care responsibilities during the week and also because she decided to CT Page 988 wait until she knew the outcome of this matter before seeking a job. While specific evidence of the defendant's earning potential was not adduced at trial, the court finds, based on her prior earnings, training as a pharmaceutical technician and dental assistant, and her stated good health that she could earn at least the amount she was earning when last employed, or ten ($10) dollars an hour. Additionally, there is no practical reason relating to the care of the children to support the defendant's continuing unemployment.
The defendant seeks alimony of three hundred ($300) dollars a week for two years to be reviewed later and a continuing order of ($1.00) a year until the younger child reaches age eighteen. The plaintiff not only wishes to pay no alimony, but during the pendency of this action he sought to modify alimony based on the defendant's cohabitation with Mr. LeBranche. Since that motion was continued by the court, Dranginis, J., until the final hearing, the plaintiff seeks to have his pendente lite motion granted, retroactive to the date of its filing.
Given the level of the plaintiff's earnings, the defendant's alimony request appears, at least facially, modest. In assessing this claim, the court is mindful that an award of periodic alimony is based primarily upon a continuing duty to support.Hotkowski v. Hotkowski, 165 Conn. 167 (1973). More recently, the Supreme Court opined: "While alimony . . . is not to be considered either as a reward for virtue or as a punishment for wrongdoing, a spouse whose conduct has contributed substantially to the breakdown of the marriage should not expect to receive financial kudos for his or her misconduct. Moreover, in considering the gravity of such misconduct it is entirely proper for the court to assess the impact of the errant spouse's conduct on the other spouse." (Citations omitted) Borkowski v. Borkowski,228 Conn. 729 (1994).
Fault, of course, is not the only criteria to be utilized by the court in assessing whether or not to award alimony. cf. C.G.S. 46b-81. In this case, fault alone does not disentitle the defendant to alimony. To deny her alimony on this basis alone would be punitive. But in this case, where the defendant left the marriage and has taken residence with another gentleman, leaving the plaintiff with the primary care of the children, and has declined to seek employment throughout the parties' separation, the court does not find that she is entitled to continuing support from the plaintiff. No alimony is awarded to either CT Page 989 party. The defendant may, at her cost, remain as a beneficiary on the plaintiff's employment-related health care policy pursuant to its applicable terms. In this regard, the plaintiff shall make available to the defendant the information and forms she may need for continuity of coverage.
The plaintiff's motion to modify the pendente lite order of alimony is, however, denied. That the defendant may have been entitled to alimony during the pendency of this action does not dictate a similar post-judgment entitlement. Conversely, the defendant's lack of entitlement, post judgment, does not lead inescapably to the conclusion that the pendente lite award was unwarranted.
While the parties agree that the defendant is entitled to an order of child support, they do not concur in the amount. The defendant seeks payment of three hundred and seventy-five ($375) dollars a week in addition to a clothing allowance. The plaintiff, in turn, proposes to pay two hundred ($200) dollars a week and an order that the parties share the costs of school functions, religious school, sports and activities. The court agrees that the plaintiff is entitled to child support even though the children are with her substantially less than they are in the plaintiff's care. Counsel for the children urges, with merit, that the children are entitled to a reasonable life style when with each parent. That the defendant may benefit from any enhancement of her life style because she receives funds for the children's care is not an unhappy prospect. The plaintiff is ordered to pay to the defendant, as child support, the sum of three hundred ($300) dollars a week. In addition, the plaintiff shall maintain the children as beneficiaries on his health insurance for so long as they are eligible and the law provides, and he shall be responsible for payment of the children's uninsured health care expenses. During the course of the hearing, the parties stipulated that the defendant is in arrears in the amount of three hundred and fifty-seven ($357) dollars, representing sums she owes the plaintiff pursuant to a pendentelite order that the parties share the responsibility for the children's unreimbursed health-care expenses. The defendant shall pay this amount to the plaintiff within two weeks of this date.
The defendant seeks an equal division of the parties' assets. In assessing this claim, the court has considered the statutory criteria set forth in C.G.S. 46b-81 as well as the purpose of property assignment, which is, ". . . to divide equitably the CT Page 990 ownership of the parties' property." Berg v. Berg,24 Conn. App. 509 (1991). The defendant shall quit claim all her right, title, and interest in and to the former marital home at 453 North Main Street, Suffield, Connecticut, and the office condominium located at 146 Hazard Avenue, Enfield, Connecticut, to the plaintiff who shall assume, pay, and hold the defendant harmless from the mortgages and all expenses attendant to ownership and use of these properties.
The plaintiff shall cause to be transferred by Qualified Domestic Relations Order (QDRO) to an Individual Retirement Account (IRA) in the defendant's name the gross sum of sixty thousand ($60,000) dollars from his pension plan. To effectuate this order, the defendant shall, within thirty days, inform the plaintiff of the financial institution and her IRA account number, and the plaintiff shall make the required transfer no later than forty-five days thereafter. The plaintiff shall be responsible for preparation of the QDRO.
As a further property settlement, the plaintiff shall pay to the defendant the sum of one hundred thousand ($100,000) dollars, payable, without interest, at the rate of three hundred and eighty-five ($385) dollars a week for a period of two hundred and fifty-nine weeks, and two hundred and eighty-five ($285) dollars for the final week.
Each party shall be entitled to ownership of the motor vehicles in his and her possession. With the exception of provisions made herein, each party shall be responsible for the payment of the liabilities shown on his and her financial affidavits, and each shall hold the other harmless from all such liabilities.
When the parties separated, they made an initial division of personal property. Though the defendant seeks additional items, the court finds that the present division is fair and equitable. Each party shall be entitled to ownership of the property in his or her possession.
With the exception of the provisions made herein, each party shall be entitled to ownership, free from any claim from the other, of all assets each presently possesses.
With respect to the defendant's counsel fees, her affidavit reflects a debt owing to her counsel in the amount of nine CT Page 991 thousand, nine hundred ($9,900) dollars. While the court heard no evidence regarding the reasonableness of this fee or its necessity, the court, having reviewed the file and heard the evidence, and mindful of the defendant's entitlement to representation, orders the plaintiff to contribute the sum of five thousand ($5,000) dollars to the defendant toward her counsel fees.
Frank Santy, Esq. was appointed by the court to represent the parties' children. While the parties reached an accord regarding care of the children prior to the commencement of this hearing, Attorney Santy's involvement in this matter has been substantial. At the hearing, he submitted an affidavit of services and a billing for the gross sum of fourteen thousand, six hundred and thirty ($14,630) dollars. The court finds his fees fair and reasonable. To date, he has been paid five thousand ($5,000) dollars by the plaintiff, leaving a balance of nine thousand, six hundred and thirty ($9,630) dollars. The court orders that Atty. Santy's fees should be shared by the parties with the plaintiff paying seventy-five (75%) percent and the defendant contributing twenty-five (25%) percent. By calculation, the defendant shall pay the sum of three thousand, six hundred and fifty-seven ($3,657) dollars, and the plaintiff shall pay the sum often thousand, nine hundred and seventy three ($10,973) dollars. In this regard, the plaintiff is entitled to a credit from counsel for the sum of five thousand ($5,000) dollars already advanced. Full payment shall be made by the parties to Attorney Santy within sixty (60) days of this date.
Unless otherwise ordered, each party shall execute and deliver the documents necessary to effectuate the terms of this memorandum within thirty days of this date.
Counsel for the plaintiff shall prepare the judgment file.
Bishop, J.
CT Page 991